IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION

| | | |
|---|---|---|
| SEAN GALLMAN, *et al.*, | * | |
| Plaintiffs, | * | |
| | * | |
| v. | * | |
| | * | Civil Action No. AW-11-2750 |
| SOVEREIGN EQUITY GROUP, INC., | * | |
| *et al.*, | * | |
| Defendants. | * | |
| | * | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

<u>MEMORANDUM OPINION</u>

Pending before the Court is Defendant Vonetta Barnes ("Barnes")'s Motion to Dismiss

for Lack of Personal Jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2).  Doc. No.

36. The Court has reviewed the motion papers and finds that no hearing is necessary.  *See* Loc.

R. 105.6 (D. Md. 2010).  For the reasons discussed below, Defendant's motion will be

GRANTED.


I.        FACTUAL & PROCEDURAL BACKGROUND

This action arises out of an investment relationship between Plaintiffs Ventura

Investments, Inc. ("Ventura"), Sean Gallman ("Gallman"), Ventura as assignee of Carolyn Tate

("Tate"), Iris Alsop ("I. Alsop"), Adrienne Alsop ("A. Alsop"), Serena Parrish ("Parrish"), and

Sidney Jennings ("Jennings"); and Defendants Prestige Capital Advisors, LLC ("Prestige") as

successor of Sovereign Equity Group, Inc. ("Sovereign"), Nicole Stallworth ("Stallworth"), the

Stallworth Firm, James E. Tyson, Jr. ("Tyson"), Victoria Hunt ("Hunt"), and Vonetta Barnes

("Barnes").  On March 21, 2012, the Court dismissed Defendants Stallworth and The Stallworth

Firm for lack of personal jurisdiction.  Stallworth served as attorney for Defendants Tyson and

Hunt, who were in the business of soliciting funds from individuals and entities and investing those funds with their corporation, Sovereign. Sovereign was a Delaware corporation that is now operating as Prestige, a Delaware limited liability company that maintains its principal office in Charlotte, North Carolina. Defendants Tyson and Hunt are North Carolina residents. Tyson served as CEO of Sovereign, while Hunt served as president. It appears that Barnes served as Senior Consultant and Chief Operations Officer of Sovereign around the time that Plaintiffs initially invested their funds with Sovereign in the summer of 2008, and became Vice President of Sovereign sometime thereafter, until her resignation on May 29, 2009. *Compare* Doc. No. 47 Ex. 1 at 2 (Executive Summary issued by Sovereign on July 30, 2008 listing Barnes as Senior Consultant and COO); *with* Doc. No. 42 Ex. 1 at 27 (undated Executive Summary issued by Sovereign listing Barnes as Vice President); *see* Doc. No. 36 Ex. 1 at 14 (copy of Barnes's resignation agreement with Sovereign).

As noted above, Plaintiffs invested in Sovereign. Plaintiff Ventura is a Maryland corporation that maintains an office in Maryland. Plaintiffs Gallman, Parrish, and Jennings are also Maryland residents. Plaintiffs I. Alsop and A. Alsop are residents of the District of Columbia. The Court understands that Plaintiff Gallman is the President of Ventura and was promised a consulting fee by Hunt for helping to procure individuals or entities to invest with Sovereign.

During August 2008, Plaintiff Gallman engaged in discussions with Defendants Tyson and Hunt about providing Sovereign with investment funds to manage. Tyson and Hunt told Gallman that Sovereign investments were currently yielding 20-to-30 percent returns, and if Gallman provided Sovereign with funds to invest, investors would be guaranteed to receive their

initial investments back in addition to investment proceeds ranging from 20-to-30 percent yearly, with payouts every 30 days.

A few weeks later, Gallman arranged to meet with Stallworth in New York City. During the meeting, Stallworth told Gallman that Sovereign was "doing good things" and explained that Gallman would transfer his investment funds to her directly and that the funds would be held in the Stallworth Firm's escrow account.  Accordingly, Stallworth created the Stallworth Firm in order to set up the transactions for her clients Tyson and Hunt.

Subsequently, the Court understands that Gallman relayed the investment opportunity to the other Plaintiffs, who then entered into investment contracts with Sovereign.  Defendant Hunt confirmed with Gallman by e-mail on August 13, 2008 that Sovereign would return each investor's principal amount with interest at 15% and that Gallman would receive a $125,000-to-$150,000 consulting fee.

Plaintiffs have made detailed allegations regarding their investments with Sovereign. Plaintiffs signed investment agreements in September 2008, and most reinvested their initial proceeds in November 2008. *See* Doc. No. 1. Exs. 1–16.  Plaintiffs have not provided any evidence that Barnes contacted Plaintiffs at any point during this period, although it appears Barnes helped draft some portion of a prospective agreement regarding Gallman's consulting fee. *See* Doc. No. 42 Ex. 1 at 10 (revisions of Gallman contract e-mailed by Barnes to Tyson and then forwarded from Tyson to Gallman). The Court understands that this agreement was never executed, as Plaintiffs have not introduced it into evidence with the rest of the investment agreements and have only produced e-mail evidence of an agreement regarding Gallman's consulting fee. *See* Doc. No. 1 Ex. 10.

Gallman attests that he first met Barnes in December, 2008, in North Carolina, although it is unclear what, if anything, the parties discussed. *See* Doc. No. 42 Ex. 1 at 5. The parties met in North Carolina again in January, 2008, although it is again unclear what, if anything, was discussed. The Court understands that Gallman telephoned Barnes on February 23, 2009 to request the return of investment funds. During the month of May, 2009, Gallman and Barnes began communicating by phone and e-mail regarding Plaintiffs' desire to end the investment relationship with Sovereign and get their investment funds back. *See* Doc. No. 42 Ex. 1 at 12–21. At this point, it appears Barnes was Vice President of Sovereign. *See* Doc. No. 42 Ex. 1 at 27. Soon after Gallman began contacting Barnes and demanding return of Plaintiffs' investments, Barnes resigned from her position at Sovereign. Doc. No. 36 Ex. 1 at 14. Curiously, it appears Barnes did not let Plaintiffs know she was resigning, as it appears she continued communicating with them at least sporadically after her resignation. *See* Doc. No. 42 Ex. 1 at 22, 24.

Altogether, it appears Plaintiffs invested a total of $261,165 with Sovereign, including amounts allegedly earned on their initial investments that were subsequently reinvested, and that Sovereign remitted $35,500 of this amount, for a total of $225,665. Pursuant to additional guarantees made by Hunt, Plaintiffs contend they are owed a total of $254,839.75. Doc. No. 1 Ex. 10. Gallman also seeks $125,000 based on the consulting fee agreement. *Id.* Although Defendants demanded payment from Barnes, Tyson, Hunt, Sovereign, and then Stallworth, no Defendant responded.

Plaintiffs brought this action on September 24, 2011, alleging breach of investment and consulting fee contracts against Prestige, as successor of Sovereign, (Counts I and II), and violation of 15 U.S.C. § 77l(a)(2) for misleading communications (Count III), fraud (Count IV),

and civil conspiracy (Count V) against Barnes the other defendants.  Plaintiffs have subsequently

dismissed Count III against Barnes, leaving Plaintiffs' fraud and civil conspiracy claims against

her.  *See* Doc. No. 42 at 2 n.1.

Defendant Prestige, as successor of Sovereign, was served with process on November 8,

2011 and failed to make an appearance in this action.  The Clerk of the Court entered Default as

to Prestige and Sovereign on December 13, 2011.  Subsequently, Plaintiffs served Defendants

Hunt and Tyson by publication in North Carolina in March, 2012.  Defendants filed no

responsive pleading, and default was entered accordingly. On May 15, 2012, the Court granted

Default Judgment in favor of Plaintiffs against Hunt, Tyson, and Prestige, on behalf of

Sovereign. The Court's judgment did not affect Barnes, who entered an appearance in this action

on May 4, 2012 and moved to dismiss this action for lack of personal jurisdiction.  *See* Doc. No.

36.  Barnes, a Hawaii resident, alleges that she does not have an office, accounts, or real or

personal property in Maryland and has never done business or solicited business in Maryland.


## II.    STANDARD OF REVIEW

When a defendant challenges the court's personal jurisdiction in a motion to dismiss, and

the court chooses to rely solely on the basis of the complaint, affidavits, and discovery materials,

the plaintiff is required only to make a *prima facie* showing of personal jurisdiction.  *See*

*Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc.*, 334 F.3d 390, 396 (4th Cir. 2003).  "In

determining whether the plaintiff has proven a prima facie case of personal jurisdiction, the court

must draw all reasonable inferences arising from the proof, and resolve all factual disputes, in the

plaintiff's favor."  *Dring v. Sullivan*, 423 F. Supp. 2d 540, 543 (D. Md. 2006) (quoting *Mylan*

*Labs., Inc. v. Akzo, N.V.*, 2 F.3d 56, 60 (4th Cir. 1993).

A federal court may exercise personal jurisdiction over a nonresident defendant if: (1) jurisdiction is authorized under the long-arm statute of the forum state; and (2) the assertion of jurisdiction comports with Fourteenth Amendment due process requirements. *See Christian Sci. Bd. of Dirs. of First Church of Christ, Scientist v. Nolan*, 259 F.3d 209, 215 (4th Cir. 2001).  The Maryland Court of Appeals has held that Maryland's long-arm statute is co-extensive with the scope of jurisdiction permitted by the due process clause of the Fourteenth Amendment, and the statutory and constitutional inquiries therefore merge in this case.  *See Carefirst*, 334 F.3d at 396–97.  The Maryland long-arm statute, however, limits specific jurisdiction to cases where the cause of action "aris[es] from any act enumerated" in the statute itself.  Md. Code Ann., Cts. & Jud. Proc. § 6-103(b)(1). Thus, a plaintiff must "identify a specific Maryland statutory provision authorizing jurisdiction." *Ottenheimer Publishers, Inc. v. Playmore, Inc.*, 158 F. Supp. 2d 649, 652 (D. Md. 2001); *see also Joseph M. Coleman & Assoc., Ltd. v. Colonial Metals*, 887 F. Supp. 116, 118–19, n.2 (D. Md. 1995).

III.    ANALYSIS

Drawing all reasonable inferences from the proof submitted to the Court in Plaintiffs' favor, Barnes's connections to Maryland appear to be extremely limited.  As discussed below, Plaintiffs have shown no evidence that Barnes reached out to Plaintiffs in Maryland or otherwise communicated with Plaintiffs at any point prior to Plaintiffs investing with Sovereign, at which point it was Plaintiffs who reached out to Barnes.  Plaintiffs additionally fail to allege their civil conspiracy claim as to Barnes with the requisite specificity to establish specific personal jurisdiction on the basis of those contacts.  *See Ohio Learning Ctrs., LLC v. Sylvan Learning, Inc.*, No. 10-1932, 2012 WL 1416905, at *5 (D. Md. 2012) (noting that "it is an inescapable

constitutional requirement that a plaintiff must first make a *prima facie* claim that a conspiracy existed before a defendant is hailed into a foreign court based on the conspiracy theory of personal jurisdiction.").

Plaintiffs have shown only that Gallman began contacting Barnes in February 2009, after the investment relationship with Sovereign had soured, and that the two subsequently communicated about the return of Plaintiffs' funds in the weeks leading up to Barnes's resignation. Because Plaintiffs have not made a *prima facie* showing of purposeful availment of Maryland law by Barnes, finding personal jurisdiction here would violate traditional notions of fair play and justice.

A.    Long-Arm Jurisdiction

It is appropriate to begin our personal jurisdiction inquiry by considering Maryland's long-arm statute. *See Dring v. Sullivan*, 423 F. Supp. 2d 540, 545 (D. Md. 2006) (consideration under the long-arm statute must remain a separate component of the analysis). Plaintiffs allege that personal jurisdiction over Barnes is proper based on two sub-sections of Maryland's long-arm statute, § 6-103(b)(1) and § 6-103(b)(4). At the motions to dismiss stage, Plaintiffs have the burden of making out a *prima facie* case for personal jurisdiction under at least one of these sub-sections.

1.    Personal Jurisdiction under § 6-103(b)(1)

Section 6-103(b)(1) authorizes jurisdiction when a person "[t]ransacts any business or performs any character of work or service in the state." Md. Code Ann., Cts. & Jud. Proc. § 6-103(b)(1). "Transacting business pursuant to subsection (b)(1) 'requires actions that culminate in purposeful activity within the state.'" *Capital Source Fin., LLC v. Delco Oil, Inc.*, 520 F. Supp. 2d 684, 689 (D. Md. 2007) (quoting *Bahn v. Chi. Motor Club Ins. Co.*, 634 A.2d 63 (Md. 1993)).

"Subsection (b)(1) does not require the defendant to have been present physically in Maryland."
*Id.* (citation omitted).

It appears to be a close call whether Barnes's conduct satisfies subsection (b)(1) of the

Maryland long arm statute.  Plaintiffs have established that Barnes communicated with Gallman,

a Maryland resident, by phone and e-mail throughout May, 2009, regarding Plaintiffs'

investment contracts with Sovereign.  *See* Doc. No. 42 Ex. 1 at 12–21.  However, "[a]n essential

factor in determining whether business transactions give rise to specific jurisdiction is whether

the defendant initiated the contact."  *CoStar Realty Info., Inc. v. Meissner*, 604 F. Supp. 2d 757,

766 (D. Md. 2009).

In this case, it appears that Gallman, rather than Barnes, initiated contact, when Gallman

called Barnes on February 23, 2009 to request return of Plaintiffs' funds from Sovereign.  *See*

Doc. No. 42 Ex. 1 at 5.  Additionally, Plaintiffs have not established that Barnes was involved

with the central business transactions underpinning this case, *i.e.* the executions of the

investment contracts and representations made to Plaintiffs around that period.  Plaintiffs have

shown only an internal e-mail written by Barnes on October 16, 2008 and subsequently

forwarded to Gallman, which shows that Barnes was involved with drafting a prospective

contract with Gallman that as far as the Court is aware, was never executed.  *See* Doc. No. 42 Ex.

1 at 10.  Given the discovery materials before the Court, it appears that while Barnes was a

Senior Consultant in 2008, she performed work for Sovereign internally and had no contact with

Plaintiffs.  As such, the work or services performed by Barnes during this time period were

performed for Sovereign in North Carolina rather than Plaintiffs in Maryland.

Additionally, it appears that Barnes was not "transact[ing]… business" in Maryland when

she later called Gallman in Maryland but was instead coordinating Gallman's request to *end* its

business relationship with Sovereign, a relationship that had begun prior to her tenure as Vice

President.  It is important in this respect that Barnes was not involved in the initial business

transactions that form the basis of this action.  Unlike Tyson and Hunt, who negotiated the

investment contracts with Plaintiffs and knew that some of Plaintiffs were Maryland residents,

Barnes neither reached out to Plaintiffs nor sought to transact any business in Maryland.  Rather,

Barnes became Vice President only after the relationship between Plaintiffs and Sovereign had

soured, and Gallman contacted her for assistance in terminating Plaintiffs' investment

agreements and returning their investment funds.  It appears that rather than provide assistance,

Barnes resigned from Sovereign.  Doc. No. 36 Ex. 1 at 14.  Looking at the substance of the

communications alleged between Gallman and Barnes, the Court finds that Barnes did not

transact any business or perform any character of work or service in Maryland sufficient to

subject her to jurisdiction under subsection (b)(1) of Maryland's long arm statute.

> 2.      Personal Jurisdiction under § 6-103(b)(4)

Section 6-103(b)(4) applies to any person who "[c]auses tortious injury in the State or

outside of the State by an act or omission outside the State if he regularly does or solicits

business, engages in any other persistent course of conduct in the State or derives substantial

revenue from goods, food, services, or manufactured products used or consumed in the State

…[.]"  "It is not necessary that the doing or soliciting of business, the engagement in another

persistent course of conduct, or the derivation of substantial revenue have any relationship to the

alleged acts giving rise to the suit."  *Sibert v. Flint*, 564 F. Supp. 1524 (D. Md. 1983) (citations

omitted).

Plaintiffs allege that jurisdiction is proper under subsection (b)(4) because Barnes caused

tortious injury in Maryland and engaged in a persistent course of conduct in Maryland through

her contacts with Gallman.  Although Plaintiffs have certainly alleged tortious injuries in

Maryland based on Sovereign's failure to remit their investment funds, Plaintiffs have not

alleged sufficient facts to support their contention that Barnes engaged in a persistent course of

conduct in Maryland.  *See* Doc. No. 42 at 6. The discovery materials submitted by Plaintiffs

show only that during the month of May, 2009, Barnes responded to several phone calls and e-

mails from Gallman demanding return of Plaintiffs' investment monies and termination of the

investment relationship with Sovereign.  It is unclear how many of the ten phone calls alleged to

have occurred between Gallman and Barnes were initiated by Barnes, but the e-mails provided

by Plaintiffs make clear that Barnes was not persistently contacting Gallman in Maryland.

The Court reiterates that it must focus on the "persistent course of conduct" of the

defendant, rather than the plaintiffs.  Although there were some documented communications

between Gallman and Barnes during the month of May, it appears Gallman was the individual

persistently seeking to communicate with Sovereign, while it appears Barnes was actively

attempting to limit her contact with Gallman and actually resigned from Sovereign soon after

Gallman began contacting her.  The e-mails provided by Plaintiffs show that Barnes was largely

unresponsive to Gallman's many attempts to contact her.  *See* Doc. No. 42 Ex. 1 at 20 (e-mail

from Gallman to Barnes dated May 28, 2009 stating that Gallman "never heard back in reference

to the emails or voicemails I left …"); *see also id.* at 17 (e-mail from Gallman to Hunt dated May

13, 2009 stating that "I left several messages and text messages with you and [Barnes] in an

attempt to reach out and resolve this."); *id.* at 15 (e-mail from Gallman to Barnes dated May 13,

2009 stating that "I have not heard back from you in reference to the items we requested

below."). Given the evidence before the Court, it appears Barnes's communications with

Gallman were sporadic at best, short-lived, and ultimately insufficient to constitute a "persistent course of conduct" in Maryland.

      B.      <u>Constitutional Minimum Contacts</u>

Even if subsections 6-103(b)(1) or 6-103(b)(4) had been found to supply valid bases for jurisdiction, Barnes has such limited contacts with Maryland that finding personal jurisdiction here would impinge on her basic due process rights. A court's exercise of jurisdiction over a nonresident defendant comports with due process if the defendant has "minimum contacts" with the forum, such that to require the defendant to defend its interests in that state "does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (internal quotation omitted). Courts have recognized two types of personal jurisdiction: general and specific jurisdiction. *See, e.g.*, *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 (1984).

      1.      <u>General Jurisdiction</u>

General jurisdiction is proper where a defendant's contacts with the forum are "continuous and systematic." *Id.* at 416. "[T]he Fourth Circuit has cautioned that broad constructions of general jurisdiction should be generally disfavored." *Estate of Bank v. Swiss Valley Farms Co.*, 286 F. Supp. 2d 514, 517 (D. Md. 2003) (internal quotation omitted). "In fact, with regard to non-residents, general jurisdiction is ordinarily reserved for those defendants who have such substantial contacts with the forum state that they may be considered 'essentially domiciled' within that state." *Id.* at 517–18.

Plaintiffs contend that general jurisdiction over Barnes is proper based on her contacts with Plaintiffs, some of whom are Maryland residents. Given the pleadings and discovery materials before the Court, this assertion borders on the frivolous. Other than the e-mail and

phone communications between Barnes and Gallman, Plaintiffs have provided no more than threadbare allegations regarding Barnes's contacts with Plaintiffs in Maryland. Plaintiffs assert, for instance, that "[e]ight investment agreements contained Maryland addresses." Plaintiffs have alleged no facts, however, showing that Barnes was involved in the negotiation or execution of these contracts. The only evidence that Barnes even saw these agreements was that Gallman attached them to an e-mail he sent out to Barnes, Hunt, and Stallworth in May, 2009 about terminating the agreements. *See* Doc. No. 42 Ex. 1 at 12. Even if Barnes was aware that Plaintiffs were Maryland residents, there is no evidence she communicated with any of them other than Gallman, and as discussed above, those communications were sporadic and short-lived.

Plaintiffs contend that general jurisdiction is proper because "Barnes engaged in continuous and systematic communications regarding the Plaintiffs' investments." Again, Plaintiffs offer no facts supporting this vague contention, and all discovery materials put forth by the parties suggest that Barnes was wholly uninvolved with Plaintiffs' investments until Gallman began contacting her, along with other Sovereign officials, for the return of those investments.

Finally, Plaintiffs contend that the Court has general jurisdiction over Barnes in Maryland because she "was an officer and director of Sovereign and benefited from the money fraudulently derived from the Plaintiffs." Plaintiffs do not explain how Barnes's position as Vice President of Sovereign, a North Carolina corporation, subjects her to general jurisdiction in Maryland. Moreover, the allegation that Barnes benefitted from the fraud appears equally threadbare, as Plaintiffs have provided no evidence that Barnes was involved in Plaintiffs' investment with Sovereign, other than possibly helping Gallman to terminate the investment agreements prior to her own resignation. Instead, drawing all reasonable inferences from Plaintiffs' pleadings,

affidavits, and discovery materials, it appears that Tyson and Hunt were the individuals who procured Plaintiffs' investments and stood to gain from them.  *See* Doc. No. 42 Ex. 1 at 2–3.

In sum, the limited Maryland ties Plaintiffs have established here fall far short of those necessary for the Court to assert general jurisdiction over Barnes.

### 2.    Specific Jurisdiction

Because Plaintiffs have not established that this Court has general jurisdiction over Barnes, they must establish that Barnes can be held subject to specific jurisdiction in Maryland. Specific jurisdiction is appropriate when: "(1) the defendant purposely directed its activities toward residents of Maryland or purposely availed itself of the privilege of conducting activities in the state; (2) the plaintiff's cause of action arises out of or results from the defendant's forum-related contacts; and (3) the forum's exercise of personal jurisdiction in the case is reasonable, that is, consistent with traditional notions of fair play and substantial justice." *Cole-Tuve, Inc. v. Am. Mach. Tools Corp.*, 342 F. Supp. 2d 362, 366 (D. Md. 2004) (quotation omitted).

Given the limited and sporadic nature of the communications between Barnes and Gallman shortly before Barnes's resignation from Sovereign, it appears Barnes's Maryland ties were transitory and that any connection Barnes had with Maryland as a result of those ties was merely "random" and "fortuitous," *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 n.18 (1985) and certainly insufficient to forge a "substantial connection" between Barnes and Maryland, *McGee v. Int'l Life Ins. Co.*, 355 U.S. 220, 223 (1957).  In considering whether Barnes purposefully directed her activities toward Plaintiffs in Maryland, the Court looked for allegations that Barnes was involved in, among other things, soliciting investments from Plaintiffs, executing the investment agreements, or later discouraging Plaintiffs from terminating those agreements.  Instead, all evidence suggests that Barnes did not play an active role in the

formation of Plaintiffs' investment relationship, and, if anything, Barnes attempted to help

Plaintiffs terminate their agreements with Sovereign prior to her resignation.

Additionally, it appears that Plaintiffs' fraud claims against Barnes are only tangentially

related to Barnes's contacts with Gallman in May, 2009.  The Court understands that Plaintiffs'

fraud claim against Barnes arises out of or results from Plaintiffs' initial investment agreement

with Sovereign and representations made during that time that Sovereign later failed to uphold.

Plaintiffs have not alleged any contacts by Barnes in Maryland around the time that Plaintiffs

invested in Sovereign, or any representations made by Barnes to Plaintiffs in Maryland prior to

or around the time the agreements were executed.  Rather, it appears any involvement by Barnes

in Plaintiffs' initial investment agreement consisted of internal work done for Sovereign in North

Carolina, and that Barnes contacts with Plaintiffs occurred only after Sovereign began failing to

meet its obligations. As a result, Plaintiffs' fraud claim against Barnes does not arise out of her

contacts with Maryland, and the exercise of personal jurisdiction on this basis would be

inconsistent with due process.

a.      Personal Jurisdiction based on Plaintiffs' Conspiracy Claim

Plaintiffs additionally allege that personal jurisdiction over Barnes is proper based on the

conspiracy alleged between Barnes and, *inter alia*, Hunt and Tyson, who engaged in more

significant contacts with Plaintiffs in Maryland.  In *Mackey v. Compass*, the Maryland Court of

Appeals held that the conspiracy theory of personal jurisdiction is valid under the Maryland long

arm statute and the U.S. Constitution.  892 A.2d 479, 486 (Md. 2006).  The conspiracy theory of

jurisdiction attributes the acts of one co-conspirator to all co-conspirators for the purposes of

determining whether minimum contacts between non-resident defendants and the forum state

have been established.  *Id.* at 484.  The Court of Appeals found that personal jurisdiction over a

defendant may be based on the actions of a co-conspirator even when the defendant has no direct

contacts with the forum, if the plaintiff establishes that:

> (1) two or more individuals conspired to do something

> (2) that they could reasonably expect to lead to consequences in a particular forum, if

> (3) one co-conspirator commits overt acts in furtherance of the conspiracy, and

> (4) those acts are of a type which, if committed by a non-resident, would subject the non-resident to personal jurisdiction under the long-arm statute of the forum state …[.]

*Id.* at 486 (quoting *Cawley v. Bloch*, 544 F. Supp. 133, 135 (D. Md. 1982)).

Although Plaintiffs allege that Barnes engaged in a civil conspiracy with the other

defendants, the Court cannot base jurisdiction on this theory because Plaintiffs have not

adequately pled a civil conspiracy. *See Ohio Learning Ctrs., LLC v. Sylvan Learning, Inc.*, No.

10-1932, 2012 WL 1416905, at *5 (D. Md. 2012) (noting that "it is an inescapable constitutional

requirement that a plaintiff must first make a *prima facie* claim that a conspiracy existed before a

defendant is hailed into a foreign court based on the conspiracy theory of personal jurisdiction.").

Here, Plaintiffs have failed to abide by Rule 9(b)'s particularity requirements in stating a

claim for civil conspiracy. Fed. R. Civ. Pro. 9(b). "The more specific requirements for an

allegation of conspiracy are that the pleader provide, whenever possible, some details of the

time, place and alleged effect of the conspiracy." *Nat'l Constructors Ass'n v. Nat'l Elec.*

*Contractors Ass'n, Inc.*, 498 F. Supp. 510, 528 (D. Md. 1980) (internal citations and quotations

omitted); *see also Waller v. Butkovich*, 584 F. Supp. 909, 931 (M.D.N.C. 1984) ("Plaintiffs must

expressly allege an agreement or make averments of 'communication, consultation, cooperation,

or command' from which such an agreement can be inferred.") (citing *Weathers v. Ebert*, 505

F.2d 514, 517 (4th Cir. 1974)).

Here, Plaintiffs allege that Defendants "had an agreement to obtain Plaintiffs' money and to deceive and commit fraud on the Plaintiffs." Compl. ¶ 140. Plaintiffs provide no further information about the agreement itself, including its time or place or what Defendants specifically did to carry the conspiracy into effect. Because Plaintiffs have not pled their conspiracy claim with sufficient particularity, this Court cannot assert jurisdiction over Barnes based on that theory.

For all these reasons, the Court finds that the exercise of personal jurisdiction over Barnes would be inconsistent with due process.


## IV.    CONCLUSION

For the foregoing reasons, Barnes's Motion to Dismiss for Lack of Personal Jurisdiction will be granted, and Barnes will be dismissed from this action. Because Barnes is the last remaining Defendant in this action, the Court having dismissed Defendants Stallworth and the Stallworth Firm and granted judgment against all other Defendants, the Court will close this case. A separate Order will follow.


__   July 16, 2012   __                                             _____/s/_____
           Date                                                    Alexander Williams, Jr.
                                                                   United States District Judge